IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LARON HARRISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1136 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION

CONTI, District Judge

*Introduction*

Pending before the court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claim of Laron Harrison ("plaintiff") for supplemental security income ("SSI") under title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. ("SAA"). Plaintiff contends that the decision of the administrative law judge (the "ALJ") that he is not disabled and therefore not entitled to benefits, should be reversed because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence and should be affirmed. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will grant summary judgment in favor of plaintiff and will deny defendant's motion for summary judgment because the ALJ's decision is not supported by substantial evidence of record.

*Procedural History*

Plaintiff previously filed an application for children's SSI benefits on February 25, 1997, and he was found to be disabled. (R. at 12.) In March 2003, his childhood SSI payments ceased due to excess unearned income. (Id.) Plaintiff protectively filed for adult SSI on February 15, 2005, claiming disability since February 1, 1997. (R. at 35-38.) Plaintiff needed to establish that his impairment satisfied the adult disability criteria in order to be eligible for SSI benefits because he was eighteen years old at the time of his current application. (R. at 12.) In August 2005, the Commissioner denied plaintiff's application for benefits. (R. at 23.)

Plaintiff requested a hearing before an administrative law judge after his application was denied. (R. at 29); however, plaintiff authorized a decision on the record through his counsel and did not appear at the hearing that was conducted by the ALJ on February 22, 2007. At the hearing, the ALJ obtained testimony from a vocational expert. (R. at 111-14.) On March 16, 2007, the ALJ issued a decision in which he found that plaintiff was not disabled and, therefore, not entitled to benefits. (R. at 18.) Plaintiff timely requested a review of the ALJ's decision (R. at 8), and by letter dated June 22, 2007, the Appeals Council denied his request for review. (R. at 4-6.) Having exhausted all available administrative remedies, plaintiff commenced the present action seeking judicial review.

*Plaintiff Background and Medical Evidence*

Plaintiff was born on February 26, 1987. (R. at 36.) He filed an application for children's SSI benefits in 1997, which was granted in the same year. His childhood SSI benefits were terminated in 2003. (R. at 12.) He filed the current application for adult SSI benefits in 2005, which was denied. (R. at 23.) At the time of the application, plaintiff had completed the ninth grade, and was enrolled in tenth grade special education classes. (R. at 42-43.)

In January 1998, Gloria Walton, NCSP, a school psychologist, conducted a psychological evaluation of plaintiff to determine his level of adaptive behavior at the time for appropriate educational planning. (R. at 73.) Plaintiff was receiving learning support in the fourth grade at Morrow Elementary School and was classified as mentally retarded at the time. (Id.) Ms. Walton concluded that plaintiff's overall measure of adaptive behavior was comparable to that of the an average individual at age six years two months and that his functional independence was limited. (R. at 74.) Ms. Walton also found that plaintiff demonstrated moderately serious asocial maladaptive behaviors and that he needed limited support, somewhat more than others his age. (Id.)

In December 2003, when plaintiff was sixteen years old, Charles Cohen, Ph.D., conducted a psychological evaluation of plaintiff. (R. at 75.) At that time, plaintiff was enrolled in the ninth grade in special education classes and had been in special education for a significant period of time. (R. at 75, 76.) Dr. Cohen's diagnosis of plaintiff's mental status was that plaintiff suffered from depression and mild mental retardation. (R. at 78.) Dr. Cohen administered the WAIS[1]-III on which plaintiff achieved a verbal IQ score of 66, a performance IQ score of 73, and a full scale IQ score of 66. (R. at 77.) Dr. Cohen reported that plaintiff appeared to be giving his best effort during the WAIS-III examination and stated that his scores reflected plaintiff's intellectual functional level at that time. (R. at 78.) The WRAT[2] 3 scores were also generally consistent with plaintiff's verbal IQ score. (Id.)

At the time of Dr. Cohen's evaluation, plaintiff's mother was in jail and he was in the care of his foster grandmother. (R. at 76.) He was also separated from most of his siblings. (R. at 76, 82.) He felt sad and unhappy and he once had a suicidal idea. (R. at 76.) Plaintiff had been

---

[1] Wechsler Adult Intelligence Scale ("WAIS").
[2] Wide Range Achievement Test ("WRAT").

seeing a therapist for a year and was still in therapy. (R. at 75, 79.) Dr. Cohen observed that plaintiff was depressed and that his learning and achievement levels were commensurate with a finding of mild mental retardation. (R. at 78.) At the end of the "prognosis" section of Dr. Cohen's report, he stated that plaintiff would continue to require very high levels of support even to function minimally in his environment. (R. at 79.)

In July 2005, another Clinical Psychological Disability Evaluation was conducted by Anthony Fallica, Ph.D., with respect to plaintiff's current application for benefits. (R. at 80.) At the time of this evaluation, plaintiff was enrolled in tenth grade special education courses. (R. at 80.) He had worked as a fast food cook in a McDonald's restaurant from November 2004 to February 2005. He worked nine hours per day and one day per week. (R. at 49.) Plaintiff stated that he stopped working there because the employer cut his hours back. (R. at 80.) In the "diagnoses" section of his evaluation, Dr. Fallica noted that both clinical impressions and a psychological report from the Pittsburgh Public Schools, dated January 29, 1998, suggested that plaintiff was suffering from an Oppositional-Defiant Disorder associated possibly with mental retardation, as well as from a learning disorder at the time of his evaluation of plaintiff. (R. at 83-84.) Dr. Fallica stated in the "prognosis" section of his evaluation that plaintiff could benefit from brief psychotherapy sessions in order to help him deal with his anger and aggressive behavior that followed his reported mild episodes of depression. (R. at 84.)

In the Medial Source Statement of Ability to do Work-Related Activities (Mental) section of his report, Dr. Fallica found that plaintiff's impairment moderately affected his ability to understand and remember detailed instructions and to carry out detailed instructions and slightly affected his ability to make judgments on simple work-related decisions. (R. at 87.) In addition, Dr. Fallica found that plaintiff's impairment slightly affected his ability to respond

appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (Id.) He also found that plaintiff cared for all his personal grooming and hygiene needs and reportedly interacted with his family members and friends. (R. at 84.) In the opinion of Dr. Fallica, however, plaintiff was not able to handle his financial affairs with adequate and sustained judgment and had a problem with concentration. (Id.) Dr. Fallica also found that plaintiff's reports of dates and events were reliable. (R. at 83.)

In the following month, August 2005, state agency psychologist Dennis Gold, Ph.D., assessed plaintiff's mental residual functional capacity. (R. at 89-91.) Dr. Gold concluded that plaintiff retained the residual functional capacity to make simple decisions and to sustain a simple routine in a work setting. (Id.)

## *Legal Standard*

A claimant seeking benefits under the SSA may seek judicial review of the Commissioner's denial of the claimant's benefits. 42 U.S.C. § 405(g). When reviewing an administrative law judge's determination subsequently adopted by the Commissioner, this court will affirm the Commissioner's finding if the finding is supported by substantial evidence. Id.; Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). Under this standard, a court is not permitted to weigh the evidence or substitute its own conclusion for that of the fact-finder. Id.; Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)

(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

*Discussion*

I. **Sequential Evaluation**

The Social Security Administration has established a five-step sequential evaluation process in order to determine whether an individual is disabled. 20 C.F.R. § 416.920(a). The steps are followed in order. If it can be determined that a claimant, plaintiff in this case, is or is not disabled at any step of the process, the evaluation will not go on to the next step. Id. The five steps are as follows: (1) whether plaintiff is engaging in substantial gainful activity; (2) if not, whether plaintiff has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"; (3) if so, whether plaintiff's severe impairment or a combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (if plaintiff's impairment meets the criteria of a listing and meets the duration requirement, plaintiff is disabled and benefits are awarded without proceeding to step four and step five, 20 C.F.R. § 416.920(d));  (4) if plaintiff's impairment does not meet the criteria of any listing, whether plaintiff has the residual functional capacity[3] to perform the requirements of his past relevant work; and (5) if not, whether plaintiff is able to do any other work which exists in the national economy considering his residual functional capacity, age, education, and work experience. 20 C.F.R. § 416.920(a)-(e).

The ALJ decided the case by implementing the five-step sequential evaluation process as required by Social Security Administration. (R. at 13.) In step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since February 1, 1997. (R. at 14.) In step two, the

---

[3] An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. §§ 404.1545, 416.945.

ALJ determined that plaintiff had the following severe impairments: a mood disorder and borderline intellectual functioning. (Id.) The ALJ, however, did not find that plaintiff satisfied step three, i.e., plaintiff's impairments did not meet or medically equal one of the listing, namely 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C (the "12.05C Listing"). (Id.) The 12.05C Listing provides in relevant part:

> 12:05 Mental retardation: Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C. The ALJ reasoned that plaintiff did not satisfy the criteria of the 12.05C Listing because he did not demonstrate functional limitations in spite of his IQ test results satisfying the 12.05C Listing requirements. (R. at 15.) The ALJ discarded the IQ test scores and concluded that plaintiff was functioning at a higher level than indicated by his IQ test results for two reasons. (Id.) The first reason was that plaintiff was still attending high school at the time of his application for adult benefits, and although he was in special education classes, there was no indication that he would not be capable of obtaining a high school diploma. (Id.) The other reason was that plaintiff had worked as a cook in a fast food restaurant for four or five months and stopped working only because his hours were cut back—not because he was unable to perform the job. (Id.)

Having concluded that plaintiff failed to meet the criteria of any listing, particularly the 12.05C Listing, the ALJ went on to make a determination of plaintiff's residual functional

7

capacity ("RFC"), and proceeded to step four and step five of the evaluation process. (Id.) The ALJ found that plaintiff had the RFC to perform heavy work, and that plaintiff was limited to performing simple, routine, repetitive tasks based on his daily activities, the symptoms and treatments of his impairments as shown in his medical records. (R. at 15-17.) In reviewing plaintiff's medical records, the ALJ also made a determination of the credibility of plaintiff's statements regarding his symptoms and the effects of those symptoms. (R. at 16.) The ALJ found that plaintiff was unable to perform any past relevant work, i.e., as a fast food cook, because the job was semiskilled and plaintiff could only perform unskilled work based on his RFC. (R. at 17.) In step five, based on the vocational expert's testimony, the ALJ found that there are a significant number of jobs existing in the national economy for an individual with plaintiff's age, education, work experience, and RFC, including such occupations as marker, laundry worker, and tree planter. (R. at 17-18.) The ALJ determined that the plaintiff was not disabled as defined in the SSA. (R. at 18.)

**II. Step Three of the Sequential Evaluation**

Plaintiff argues that the record establishes that his conditions meet the criteria of a listing, namely, the 12.05C Listing, and that he is, accordingly, entitled to benefits automatically as a matter of law. See C.F.R. § 416.920(a)(4)(iii), (d). Plaintiff asserts that the 12.05C Listing requires a two-prong test, and in order to meet its requirements, a claimant must show i) that he has a valid verbal, performance or full scale IQ of 60 through 70, a condition affecting his functioning before age twenty-two, and ii) that he has a physical or mental impairment imposing additional and significant work related limitations of function. Plaintiff claims that he satisfies the requirement of the first prong because he had an IQ test when he was sixteen years old and had valid verbal and full scale IQ testing scores of 66 (R. at 78), and he was diagnosed with mild

mental retardation when he was eleven and sixteen years old (R. at 73, 78). Plaintiff was also diagnosed by Dr. Cohen and Dr. Fallica with a mood disorder, i.e., depression, an impairment that satisfies the second prong of the test. (R. at 74, 78.) Plaintiff points out that the ALJ acknowledged that there was a valid IQ test score of 66, and found that plaintiff suffered from depression, an additional severe impairment. Plaintiff was found to meet the listings as a child because of his mood disorder and borderline intellectual functioning (R. at 14), which is additional evidence that plaintiff met the criteria of the 12.05C Listing. Therefore, plaintiff argues that he should have been awarded benefits at step three without proceeding to the next two steps.

Defendant argues that in order to meet the criteria of the 12.05C Listing, plaintiff must demonstrate "deficits in adaptive functioning" prior to age twenty-two, which is a separate requirement of the 12.05C Listing, in addition to an IQ score of 70 or lower. Defendant supports his position in interpreting the 12.05C Listing by comparing the language used in the 12.05C Listing with the requirements of mental retardation as defined in American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-IV-TR) 41-43 (4th ed. 2000) ("DSM-IV-TR"). Defendant contends that the evidence of record failed to demonstrate that plaintiff had significant deficits in adaptive functioning because plaintiff had the intellectual capacity to remain in the tenth grade by taking special education courses and because he once worked at a semi-skilled, fast-food cook position for several months. Defendant further disputes the effectiveness of plaintiff's IQ score, arguing that a valid IQ score alone is not conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record with respect to plaintiff's daily activities and behavior. Defendant concludes that plaintiff was functioning at a higher level than indicated by the IQ scores based

9

on Dr. Fallica's observation that plaintiff had adequate hygiene, unremarkable behavior, good eye contact, unremarkable thought processes, clear and coherent speech, and adequate recent and remote memory. Defendant asserts that plaintiff did not meet the requirement of deficits in adaptive functioning, and cannot meet all the criteria of the 12.05C Listing.

The essential issue in this case is whether plaintiff meets the criteria of the 12.05C Listing and is entitled to SSI benefits without the need to consider steps four and five of the sequential evaluation. There is no question that plaintiff's mental condition had an onset date prior to age twenty-two. On February 1, 1997, when plaintiff was eleven years old, he was found to be disabled by the reason of his mental condition. (R. at 12.) The question is whether, with two valid IQ test scores below 70 (verbal IQ of 66 and full scale IQ of 66)[4] and a mood disorder, plaintiff meets the requirements of the 12.05C Listing and is thereby qualified for SSI benefits without the need for further evaluation.

A. *Three-prong Test*

There is a three-prong test that must be applied to determine whether a claimant meets the criteria of 12.05C Listing[5]. The United States Court of Appeals for the Third Circuit has considered the requirements of the 12.05C Listing in several of its holdings, either as a three-prong test or as a two-prong test. See Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003) (stated the test as three-prong); Williams v. Sullivan, 970 F.2d 1178, 1184 (3d Cir. 1992) (stated the test as two-prong). In Markle, the court of appeals stated that in order to meet the requirements of the 12.05C Listing, a claimant must "i) have a valid verbal, performance or full scale IQ of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was

---

[4] The administrative law judge is to consider the lowest IQ test score for the purpose of the 12.05C Listing. 20 C.F.R., pt. 404, subpt. P, app. 1, 12.00D(6)(c).
[5] Plaintiff defines the same test as two-prong because he combines the onset date requirement with the other prongs.

initially manifested during the developmental period (before age 22)." Markle, 324 F.3d at 187. The court in Williams characterized step three of the five-step evaluation process as providing that a claimant is disabled *per se* by meeting or equaling certain listed impairments. Williams, 970 F.2d at 1184. The court quoted the text of 20 C.F.R. pt, 404, subpt. P, app. 1, §12.05, including the introductory paragraph and part C, and stated that under the 12.05C Listing criteria, a claimant "is presumptively disabled if a) he is mentally retarded, as evidenced by an IQ between 60 and 70, and has been so since before the age of 22; and b) he has another impairment in addition to the mental retardation, that imposes an additional and significant work-related limitation of function." Id. at 1184. This test, although stated as a two-prong test, is essentially the same as the three-prong test described in Markle. See Markle, 324 F.3d at 187.

Defendant mischaracterizes Williams and Markle when citing these two decisions as authority to support his argument that plaintiff was required to prove that he had "deficits/significant limitation in adaptive functioning" in order to meet the threshold requirements to establish mental retardation. The applicable regulations set forth the requirements of the 12.05C Listing:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.
>
> 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A.

Defendant contends that the 12.05C Listing's introductory paragraph requires additional proof of "deficits in adaptive functioning" beside that which is set forth in section 12.05C in order to establish mental retardation. The plain language of the regulation, however, does not contain that requirement. After the introductory paragraph, the 12.05 Listing provides: "The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05

(emphasis added). The level of the severity is determined by considering the requirements of A, B, C, or D, not by separately proving that there are "deficits in adaptive functioning." The introductory paragraph adds the criteria of manifestation before age twenty-two. The case law reflects that criteria in applying the three-prong test, which as noted is: i) a valid verbal, performance or full scale IQ of 60 through 70, ii) a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) initial manifestation of impairments during the developmental period (before age twenty-two). Markle, 324 F.3d at 187. Courts of appeals in other circuits also recognize the three-prong test for determining whether the 12.05C Listing is satisfied. See Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) (recognized the three-prong test for 12.05C Listing and rejected the argument that section 12.05's introductory paragraph requires that a claimant has to be first determined to be mentally retarded); Mendez v. Barnhart, 439 F.3d 360, 361-62 (7th Cir. 2006) (same).

In Markle, the administrative law judge rejected the claimant's IQ score and determined that the claimant, Markle, did not meet the requirements of the 12.05C Listing. Markle, 324 F.3d at 184-85. Markle's IQ test revealed a full scale IQ score of 70 and other scores higher than 70. Id. at 183. The administrative law judge found that Markle's physical condition constituted an additional severe impairment and met the requirement of the second prong of the three-prong test of 12.05C Listing. Id. at 187-88. The administrative law judge, however, rejected the full scale IQ test score based on Markle's behavior and activities and found that Markle did not establish that he had a valid IQ score of 70 or lower, the first prong of the three-prong test. Id. at 184. The court of appeals concluded that the administrative law judge erred when he failed to credit Markle's full scale IQ score of 70. Id. at 183. The court pointed out that because the administrative law judge concluded that Markle did not meet the 12.05C Listing due to Markle's

failure to established the IQ score requirement for 12.05C Listing, he did not inquire into the third requirement for the impairment, which is reflected in the introductory paragraph of the 12.05C Listing, "namely, whether Markle's mental retardation was initially manifested during his development period" or "before age 22." Id. at 188. The court remanded the case to the administrative law judge so that he could develop the record further and determine whether Markle met "the third element of a [12.05C Listing] impairment, namely whether his retardation commenced before age 22." Id. at 189. It was clear that if Markle's retardation began before age twenty-two, he would satisfy the 12.05C Listing. There was no requirement that a claimant show "deficits in adaptive functioning" as a separate requirement; otherwise, there would be a fourth prong to the test.

In Williams, the relevant issue was whether the mental condition of the claimant, Williams, commenced before age twenty-two. Id. at 1184. Williams was born in 1934 and, among other things, had worked in a steel drum factory for twenty-two years. Id. at 1181,1185. He stopped working in 1986. Id. at 1181. In 1987, a psychologist diagnosed him as having a verbal scale IQ score of 66 on the WAIS. Id. The court of appeals held that for 12.05C Listing purposes, a valid verbal scale IQ test conducted by a qualified professional using the WAIS was sufficient to establish the 12.05C Listing requirement relating to the IQ score. Id. at 1184. The court, however, held that Williams' IQ score did not establish "deficient intellectual functioning <u>initially manifested during the development period (before age 22)</u>." Id. at 1185 (emphasis added). The court stated that the IQ test administered by the psychologist measured only Williams' "current intellectual functioning," and did not document lifelong mental retardation. Id. The severity of "significantly subaverage general intellectual functioning" and "deficits in adaptive functioning" is measured by the language of paragraph C of the 12.05C Listing, but the

introductory paragraph also requires manifestation of the mental retardation before age twenty-two.

Defendant also contends that the definition of mental retardation in DSM-IV-TR should be applied as the standard for the purpose of determining disability benefits. In revising the listings of impairments in 2002, the Commissioner rejected a proposal that the DSM-IV's definition be used for Listing 12.05:

> Comment: One commenter recommended that we use the definition of mental retardation (MR) found in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV), published by the American Psychiatric Association, as the definition of MR in listing 12.05 and 112.05.
>
> Response: We did not adopt the comment. The definition of MR we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations.
>
> The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits.

67 Fed. Reg. 20022 (Apr. 24, 2002); see Maresh, 438 F.3d at 899. The plain language of the regulation reflects that the definition used by the Social Security Administration in the 12.05 listing is not subject to the definition used by any professional organization; rather, it is, itself, sufficient for the purpose of determining eligibility for disability benefits.

Defendant's argument that "deficits in adaptive functioning" referred to in the introductory paragraph are required to establish mental retardation in addition to and independent of a low IQ score is not supported by the plain language of the regulation or the case law. A factual determination whether a plaintiff's medical record has demonstrated that a plaintiff has significant deficits in any of the areas of adaptive functioning as listed in DSM-IV-

14

TR is not required; that determination is not part of the three-prong test required to satisfy the 12.05C Listing. See Markle, 324 F.3d at 187.

    B.  *Application of Three-Prong Test*

    *1. Determination of First Requirement: the validity of an IQ score of 60 through 70*

Defendant argues that plaintiff's IQ scores of 70 or below, though valid *per se*, should be rejected because the scores were inconsistent with other evidence in record with respect to plaintiff's daily activities and behavior. Defendant correctly observed that an administrative law judge may reject an IQ test score, but there must be substantial evidence of record to support a finding that the score was invalid. Markle, 324 F.3d at 187. The Court of Appeals for the Third Circuit specifically stated that an administrative law judge cannot reject IQ scores based on "personal observations of the claimant and speculative inferences drawn from the record." Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000).

In Markle, the plaintiff completed the ninth grade of special education classes and dropped out of school in the tenth grade. He later obtained a general equivalency diploma. Markle, 324 F.3d at 183. He could read, write, add, subtract, and did some job painting, wallpapering and grass cutting more than fifteen years ago prior to the decision. Id. He lived independently; he could pay his own bills, use an ATM machine and take care of his personal needs. Id. A psychologist concluded in his evaluation that Markle had a good ability to use judgment in his work, and had a fair ability deal with work stresses and maintain attention and concentration. Id. Markle was also found to be able to understand and carry out complex and detailed job instructions. Id. at 184. The doctor also observed that Markle's gait, posture, manner and hygiene were normal and that his general appearance was appropriate. Id. at 183. The doctor, however, did not find that Markle's full scale IQ score of 70 was invalid. Id. at 187. The court of

appeals concluded that the positive aspects noted in the doctor's report and the various activities in which Markle was able to engage did not constitute sufficient evidence for the administrative law judge to reject the validity of Markle's IQ test score. Id. The court also recognized that a claimant's abilities to "make change, do laundry and clean his room" were not inconsistent with his full scale IQ score of 70 or below or the qualification of mental retardation. Id. (citing Brown v. Sec'y of Health and Human Serv., 948 F.2d 268, 270 (6th Cir. 1991)).

The court of appeals has recognized that the validity of an IQ score might be rejected with substantial evidence of record. The court of appeals in Markle distinguished two decisions in other circuits where an IQ score below 70 was rejected. Id. In Clark v. Apfel, 141 F3d. 1253, 1255-56 (8th Cir. 1998), the Court of Appeals for the Eighth Circuit rejected the claimant's IQ score of 66 because she did housework, i.e. cooking, cleaning, shopping, etc., she was the primary caretaker of her young daughter, she completed ninth grade without special education classes and she worked in the private sector. In addition, except for one non-treating psychologist, no physician had ever found the claimant to be retarded or suspected as much. Id. at 1255. In Popp v. Heckler, 779 F.2d 1497, 1498-99 (11th Cir. 1986), the Court of Appeals for the Eleventh Circuit concluded that the claimant was not mentally retarded despite a performance IQ score of 69 because he had a two-year college associate's degree and was close to completing the requirements for a bachelor of science degree, and he, among other things, had a history of several skilled jobs, including teaching high school algebra, working as an administrative clerk in the Army and as a statistical clerk at a veterans administration hospital. In a decision cited by defendant, Muse v. Sullivan, 925 F.2d 785, 788-89 (5th Cir. 1991), the Court of Appeals for the Fifth Circuit affirmed the administrative law judge's decision that the two IQ tests that the claimant took were invalid because he did not wear glasses during the first IQ test and the doctor

who administered the claimant's second IQ test noted that the claimant could not see well during the second test even though he wore glasses. In addition, the claimant worked as a truck driver making deliveries, and he passed a written exam to obtain his chauffeur's license. Id. at 789-90. The court in Muse held that the administrative law judge's finding of invalid IQ scores was supported by substantial evidence. Id. at 790.

      The current case, like Markle, is distinguishable from the decisions which held a claimant's IQ scores invalid because there is no objective medical evidence in the record here to invalidate the results of plaintiff's IQ tests and there is no substantial evidence supporting a finding that plaintiff's IQ score is inconsistent with his daily activities and behavior. Dr. Cohen, who administered the IQ test for plaintiff, considered the scores valid in his report and noted that plaintiff did his best during the examination, and that his scores reflected plaintiff's intellectual functional level. (R. at 77.) There is no contradiction among the diagnoses offered by three different psychologists with respect to plaintiff's mental status. Plaintiff has been in special education classes for a long time, and he was still enrolled in tenth grade special education classes when he filed the application for benefits[6]. (R. at 75.) He never engaged in any skilled job and the ALJ concluded that he could not perform semi-skilled or fast-paced work. (R. at 17, 112.) Plaintiff's activities fell below the level discussed in Markle, which the court of appeals in Markle found to be consistent with qualifying medical retardation. See Markle, 324 F.3d at 187. Unlike Markle, plaintiff could not live independently (he has been in the care of either his mother or foster grandmother (R. at 75, 80)); he could not handle his own financial affairs with adequate and sustain judgment (R. at 84); he could not understand or carry out complex and detailed instructions, but only short, simple ones, and only had capacity to make simple decisions (Id.); he

---

[6] Defendant argued that this case is distinguishable from the facts in Markle because plaintiff was still attending high school in special education courses, while Markle dropped out of special education courses in the tenth grade. This court finds that difference does not constitute substantial evidence that plaintiff's IQ test scores were invalid.

could not concentrate well, and, his social judgment appeared to be mildly impaired. (R. at 83.) Plaintiff, like Markle, was able to take care of his own hygiene and could help with some cooking, shopping and cleaning at home. (R. at 81, 84.) The court of appeals in Markle determined that kind of evidence was not sufficient to prove that a claimant with an IQ score of 70 or below is not mentally retarded for the purpose of meeting the first prong of the 12.05C Listing. Markle, 324 F.3d at 187. The ALJ, like the administrative law judge in Markle, appears to have utilized his personal opinion rather than the opinions of qualified medical professionals regarding the validity of the IQ test scores. There is no substantial evidence of record to support the ALJ's rejection of plaintiff's IQ test scores. To the contrary, substantial evidence of record supports plaintiff's position that his verbal and full scale IQ scores of 66 were valid.

*2. Other Two Requirements: Additional Severe Impairment and Onset date before Age 22*

Plaintiff argues that he has been diagnosed as having a mood disorder, namely, depression, which is severe and, therefore, that he satisfies the second prong of the 12.05C Listing test—an additional severe mental or physical impairment. Defendant did not question whether plaintiff met the second requirement of the 12.05C Listing. This court finds that the medical evidence is consistent with plaintiff's position and the ALJ's findings. Plaintiff's medical records consistently show that he has a history of depression. He has appeared to be sad, and he has experienced auditory hallucinations, suicidal ideations and aggressive ideations since childhood. (R. at 76, 81.) In addition, the ALJ explicitly found that plaintiff had the severe impairment of a mood disorder in his step-two evaluation of the five-step evaluation process. (R. at 14.) If the administrative law judge finds a separate severe impairment apart from the claimant's mental retardation in step two of the evaluation process, the second requirement is satisfied.

> [T]he Commissioner in new regulations on the evaluation of mental disorders addressed the second prong of § 12.05C, stating that '[w]e always have intended

the phrase to mean that the other impairment is a "severe" impairment as defined in §§ 404.1520(c) and 416.920(c).'

Markle, 324 F.3d at 188 (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50772 (Aug. 21, 2000)). Consistent with the plain language of the regulation and the decision in Markle, this court must conclude that the ALJ's finding of a severe impairment relating to a mood disorder satisfies the second prong of the 12.05C Listing test.

There is no question that plaintiff's onset of his mental impairment occurred before he was twenty-two years old. He has not reached the age of twenty-two, and he was found to be disabled in 1997, and qualified for children's SSI by reason of his mood disorder and his borderline intellectual functioning. (R. at 12.) Under those circumstances, the record reflects that plaintiff has satisfied the third requirement of the 12.05C Listing.

### *Conclusion*

In light of all the evidence in the record, this court concludes that plaintiff meets the criteria of the 12.05C Listing and, therefore, is *per se* disabled and entitled to disability benefits. The ALJ erred in imposing an additional criterion of "deficits in adaptive functioning" to the three-prong test described by the United State Court of Appeals for the Third Circuit to determine whether a claimant meets the requirements of the 12.05C Listing. The administrative record has been fully developed and the substantial evidence of record, considered as a whole, indicates that plaintiff is disabled and is entitled to SSI benefits. Under those circumstances a remand for further administrative proceedings is not warranted and the decision of the ALJ must be reversed. See Morales, 225 F.3d at 320. Summary judgment will be entered in favor of plaintiff (Docket No. 5) and defendant's motion for summary judgment will be denied (Docket

No. 8). The decision of the ALJ is reversed and this case is remanded for the calculation and award of benefits to which plaintiff is entitled from February 15, 2005 (protective filing date).

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: August 29, 2008

cc. Counsel of record